ROBERT M. MURPHY, Judge.
| ^Defendant Jaron Bibbins appeals his conviction for manslaughter, a violation of La. R.S. 14:31, contending that the trial court improperly admitted a police officer’s testimony recounting victim’s statement made a day before his death and that the trial court erred in denying defendant’s motion for mistrial based on juror misconduct. For the reasons that follow, we affirm.

PROCEDURAL HISTORY

On April 1, 2010, defendant, Jaron Bib-bins, was indicted by a Jefferson Parish Grand Jury with one count of the second degree murder of Joey Bullock, a violation of La. R.S. 14:30.1 (count one),[1] and two counts of possession of a firearm while in possession of a controlled dangerous substance, violations of La. R.S. 14:95(E) (counts two and three).[2] Defendant was arraigned on April 5, 2010, |sand pled not guilty. On June 19, 2013, the State dismissed counts two and three of the indictment.
The trial court heard and denied defendant’s motion to suppress statement, evidence, and identification on April 24, 2012, and May 24, 2012. On June 21, 2012, a hearing was held on defendant’s Motion to Exclude Dying Declaration/ Motion to Exclude Decedent’s Statement, and the State’s Notice of Intent to Use Evidence of Other Crimes/Res Gestae. After taking the matter under advisement, on June 28, 2012 the trial court denied defendant’s motion and granted the State’s notice of intent to use other crimes evidence.
Trial commenced on September 18, 2012, before a 12-person jury. On Sep *157 tember 21, 2012, the jury found defendant guilty of the responsive verdict of manslaughter.
On October 17, 2012, defendant filed a motion for new trial based on alleged juror misconduct. The trial court heard defendant’s motion for new trial on December 3, 2012, January 7, 2013, and March 28, 2013. The trial court denied defendant’s motion for new trial on May 30, 2013. Prior to sentencing, on June 17, 2013, defendant argued a second basis for a new trial on sufficiency grounds. The trial court denied defendant’s new trial motion and thereafter sentenced defendant to 35 years imprisonment at hard labor.[3] After sentencing, defendant’s motion for reconsideration of sentence was also heard and denied.
Defendant filed a motion for appeal on June 20, 2013, which the trial court granted on June 21, 2013.

FACTS

On November 14, 2009 at approximately 3:02 a.m., Sergeant Darren Monie, Lieutenant Michael Kinler, and Deputy Hyla-nia Purcell, all of the Jefferson Parish ^Sheriffs Office, responded to a vehicular burglary call at 1108 Crepe Myrtle Street, in a high crime area known as Tallow Tree. Upon arrival, it was discovered that the incident involved a shooting. While at the scene, the officers observed a white Dodge minivan parked in the street.[4] The rear window of the van was shattered as a result of a bullet hole in the window.[5] Inside the van, the victim, Joey Bullock, was slumped over the steering wheel, unresponsive, and suffering from a gunshot wound to his abdomen. Prior to placing him in the ambulance, Lieutenant Kinler was able to speak briefly with the victim who stated that he was “in the [Tallow Tree] area trying to buy crack cocaine, and he was shot by a black male.”[6] At that time, the victim was unable to provide any further description of the shooter.[7] The victim died five days later, on November 19, 2009, as a result of his injuries.
Dr. Susan Garcia, an expert in the field of forensic pathology, testified that she performed the autopsy on the victim on November 20, 2009. She determined that the cause of death was a “distant range gunshot wound to the left abdomen.”[8] During the autopsy she also recovered a projectile from the victim’s right thigh. She concluded that the projectile entered the victim through his left lower abdomen and traversed down into his right thigh. Dr. Garcia opined that the manner of death was a homicide.
*158 On November 21, 2009, approximately one week after the shooting, Deputy Joshua Collins, of the Jefferson Parish Sheriffs Department, was patrolling the |5Tallow Tree area when he received information regarding narcotics distribution at 1061 and 1065 Tallow Tree. He was also informed that black males at that location were carrying firearms.[9] During his surveillance of the area, Deputy Collins observed a group of black males congregating outside. Three of the black males then entered a truck, and Deputy Collins followed. When the truck failed to stop at a stop sign, Deputy Collins attempted to conduct a traffic stop. A high speed chase ensued when the men failed to pull over. The truck eventually struck a tree, and the driver and front seat passenger fled the vehicle on foot. The back-seat passenger, later identified as Devan Smith, also fled. Deputy Collins gave chase, and after encountering physical resistance from Smith, placed him under arrest. Deputy Collins radioed descriptions of the other two subjects, later identified as defendant and Antoine Jenkins, to responding officers. Specifically, Deputy Collins informed the other officers that he recognized defendant as the person wanted for questioning in connection with the shooting that occurred in Tallow Tree the week before. Defendant and Jenkins were subsequently apprehended and brought to Deputy Collins who positively identified them as the two men who fled the vehicle.[10] Defendant, Jenkins, and Smith were then transported to the Detective Bureau for further questioning.
Upon inspection of the abandoned vehicle, Deputy Collins observed a 9 mm pistol on the floorboard of the front passenger seat and an AK-47 on the back seat. Two cell phones were also located in the vehicle. One of them belonged to defendant and the other to Smith. A check of the 9 mm weapon revealed that it |fihad been reported stolen on November 2, 2009. Deputy Collins further testified that defendant exited the truck from the front passenger seat where the 9 mm was located, and Smith exited from the back seat where the AK-47 was located. Deputy Collins testified that defendant’s height and weight were 5'9" and 160 pounds.[11]
A link was established between the November 14, 2009 shooting and the November 21, 2009 ear chase. Meredith Acosta, an expert in the testing and analysis of ballistic evidence, testified that she examined the projectile recovered from the victim’s body in the shooting and the 9 mm pistol found on the front floorboard of the truck from which defendant fled in the car chase. She determined that the projectile was fired from the 9 mm pistol.
Mary Eames testified that she was acquainted with defendant and received phone calls from him, from phone number (504) 896-0144, between October 21, 2009 and November 23, 2009.[12] The last call *159 she received from defendant was from jail on November 23, 2009. Ms. Eames further testified that pursuant to defendant’s request, she signed out his personal belongings being held at the jail, which included his cell phone. She then delivered the property to an unknown black male at a Shell gas station.
Sergeant David Spera, of the Jefferson Parish Sheriffs Office, testified that the victim was again unable to make an identification of the person who shot him; however, the victim was able to provide a more detailed physical description of the shooter. He described him as “five-ten to six feet tall, thin to medium build with twisted or braided hair that was a couple of inches long” and wearing a white hooded sweatshirt. The victim further informed Sergeant Spera that he was in the 17Tallow Tree area attempting to purchase narcotics. He told the detective that when he did not like the deal, he attempted to leave, at which time the seller pulled out a gun and shot him through the car window.
Sergeant Spera also interviewed defendant, Smith, and Jenkins following their arrests by Deputy Collins in the traffic matter. In a taped statement, defendant told Sergeant Spera that on the night of the shooting he was at his mother’s house in Avondale. However, after being confronted with the contrary statements made by Smith and Jenkins, defendant gave a taped statement in which he indicated that on the night of the shooting, he and Smith were at the Gator Bait bar in Gretna. He stated that they were at the bar until 3:00 a.m. and then went to his girlfriend’s house until 9:00 a.m. He denied seeing or touching any guns and denied knowing the victim or seeing anyone with a white minivan in the Tallow Tree neighborhood.
Devan Smith, a friend of defendant, testified that he was charged and pled guilty to simple battery of a police officer, simple criminal damage, and flight from an officer, arising from the police chase that occurred in November of 2009. Smith testified that during the police chase, he was in the back seat, defendant was in the driver’s seat, and Jenkins was in the front passenger seat. Smith testified that prior to the chase, he was aware that the vehicle contained a 9 mm pistol and an AK-47. He further stated that he asked defendant that evening about the pistol before the chase, and defendant told him it was a 9 mm and that it was “hot.” He also testified that defendant told him the pistol had been “put to work.” Smith testified that he was not with defendant at the Gator Bait bar on the night of the shooting.
Sergeant Kevin Decker, homicide investigator for the Jefferson Parish Sheriffs Office, testified that the victim was shot on November 14, 2009 and died on November 19, 2009. He did not become involved in the investigation of the |scase until November 23, 2009. After being informed of the substance of the statements given by defendant, Smith, and Jenkins, Sergeant Decker traveled to the Gator Bait bar and spoke to its owner, Monique Riley.[13] He learned from Ms. Riley and from a review of the bar’s surveillance videos that defendant had not been at the Gator Bait bar on the night of the shooting.
Based on this information, Sergeant Decker decided to interview Jenkins for a second time to determine whether he had any further information about the murder. He noted that in Jenkins’ first statement *160 to Sergeant Spera, he stated that he had been at home on the phone with a girl named Euriea Craft on the night of the shooting.[14] However, after obtaining the necessary phone records, Jenkins’ alibi could not be corroborated. When confronted with the phone records, Jenkins claimed that he was using defendant’s cell phone to-speak to Ms. Craft that evening.[15] Jenkins also admitted that he was in fact in Tallow Tree on the night of the shooting and identified Jeremy Mims and Antonio Carto as two other subjects at the scene that night. He further told Sergeant Decker that he was “standing around” with Carto that night when Mims and defendant approached the white minivan. Jenkins stated that defendant then shot the victim. He stated that at some point afterwards defendant asked him to hold a 9 mm pistol for him.
Sergeant Decker then interviewed Carto who admitted that he was in the Tallow Tree neighborhood on the night of the shooting. He identified defendant, Mims, Jenkins, and a man named Kerry Swatt[16] as also being at the scene that |anight. According to Carto, both defendant and Jenkins were armed with guns. He further stated that Jenkins stood at the passenger side door of the victim’s vehicle, while defendant and Mims stood at the driver’s side door. An argument then ensued over price surrounding a crack cocaine deal, at which time Mims reached into the victim’s vehicle, placed it in park, and began to punch the victim. Defendant and Jenkins then pulled out their guns. Carto ran when he heard gunfire but did not see who fired.[17]
Ronald Kennedy, an expert in the field of radio-frequency engineering, testified that he reviewed the records between the morning hours of November 13, 2009, through the morning of November 14, 2009, from phone number 896-0144. Using cell tower data, he was able to determine that between 11:30 p.m. on November 13, 2009 until approximately 3:30 a.m. on November 14, 2009, the only cell tower hitting from that phone number was within the Tallow Tree Area. Between those relevant time periods, the indicated cell phone never hit the cell phone tower covering the area surrounding the Gator Bait bar.
Jenkins, defendant’s cousin, testified that he was originally charged along with defendant for the second degree murder of Bullock but that he made a deal with the State, pled guilty, and was currently incarcerated for obstruction of justice and file-gal carrying of a firearm.
Jenkins further testified that he was acquainted with Smith, Carto, and Mims from the Tallow Tree area. Around 2:00 a.m. on the night of the shooting, Jenkins was with defendant and Smith in the Tallow Tree neighborhood selling drugs.[18] *161 Jenkins recalled that a van pulled up and defendant, “Antonio [Carto], and another person” approached the van to conduct a drug transaction. -Defendant went up to |inthe driver’s side of the van. In the process of defendant’s trying to complete the sale, Jenkins testified that the man in the van attempted to take the drugs. According to Jenkins, “the man slapped [defendant’s] hand, and the crack falls [sic] in the van. And the man tried to pull off.” Jenkins testified that defendant then drew his 9 mm gun from his waistband and started shooting. Jenkins testified that he observed defendant point his gun in the ear window and fire. After hearing three gunshots, Jenkins saw the van back up and drive off, after which time two more shots were fired into the back of the van. Jenkins, Smith, and defendant then left the area in their truck.
After the shooting, defendant asked Jenkins to “hold” the gun for him. Jenkins held on to the gun for defendant until the next day, although he still saw the gun every day after that. Jenkins recalled defendant stating to him that “he didn’t mean to shoot him [the victim], but he thinks he shot him.” Jenkins identified the 9 mm pistol recovered from the truck after the high speed chase that occurred a week later, as the weapon used to shoot the victim. Jenkins also identified the two cell phones recovered from the truck as those belonging to defendant and Smith.[19]
Jenkins admitted that he made multiple statements to the police. At first he was untruthful and told the police that he was at home at the time of the murder. He later confessed that he was not at home, but rather talking to Ms. Craft on defendant’s cell phone that night.
Kerry Swatt testified that on the night of the shooting, he was spending the weekend with his aunt in Tallow Tree. While Swatt smoked outside, Carto, Mims, Jenkins and defendant walked up. Swatt then recalled that a van occupied by a man with “white skin complexion” piffled up. Defendant, Mims, and Jenkins went |nup to the driver’s side of the vehicle.[20] Swatt testified that he was talking to Carto when he heard “fussing” followed by several gunshots. Swatt further testified that he did not see a gun or who did the shooting. He also noted that before the gunshots were fired, Jenkins was standing towards the front of the van, and defendant was by the driver’s side.

LAW AND DISCUSSION

In his first assignment of error, defendant argues that the trial court erred in denying his motion to exclude the victim’s description of the shooter because the description did not constitute a “dying declaration” or a “police explanation” exception to the hearsay rule. Defendant further maintains that the error in admitting the statement was not harmless beyond a reasonable doubt. He asserts that the hearsay description related by Sergeant Spera was the only direct, unbiased evidence used to convict defendant.
The State responds that although not argued at the hearing, the admission of the victim’s statement as a dying declaration is supported by the record, as established by the victim’s demise the day following his description of the shooter. The State further submits that the statement was nonetheless properly admitted pursuant to the “police explanation” exception to the hearsay rule. Alternatively, the State argues *162 that even if erroneously admitted, the admission of the testimony concerning the victim’s description of the shooter was harmless beyond a reasonable doubt.
Prior to trial, defendant filed a Motion to Exclude Dying Declaration/Motion to Exclude Decedent’s Statement. In his motion, defendant argued that the statement the victim made to Sergeant Spera, regarding the physical description of his assailant, should be excluded as hearsay pursuant to La. C.E. art. 801(C). | ^Specifically, the victim was shot on November 14, 2009 and died at the hospital from the gunshot wound on November 19, 2009. On November 18, 2009, the day prior to his death, the victim told Sergeant Spera that the man who shot him was a black male, wearing a hooded sweatshirt, 5'10" to 6' tall, thin to medium build, with braided or twisted hair a few inches long. In his motion, defendant argued that the victim’s description does not constitute a dying declaration.
At the June 21, 2013 hearing on defendant’s motion, defendant reiterated that the victim’s statement made to Sergeant Spera should be excluded as hearsay and should not be admitted under the dying declaration exception pursuant to La. C.E. art. 804. In response, the State argued that it would not be using the victim’s statement as a dying declaration but rather to explain the course of the police investigation and how defendant was developed as a suspect. The State asserted that such an explanation constituted a hearsay exception. The trial court denied defendant’s motion without reasons.
A trial judge’s determination of the admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Odoms, 01-1038, p. 10 (La.App. 5 Cir. 3/26/02), 815 So.2d 224, 230-31, writ denied, 02-1185 (La.11/22/02), 829 So.2d 1037.
Hearsay is an out-of-court statement, other than one made by the declarant while testifying at the present trial, offered to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay evidence is generally inadmissible unless otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Dyer, 00-1866 (La.App. 5 Cir. 4/24/01), 794 So.2d 1, 12, writ denied, 01-1579 (La.6/27/03), 847 So.2d 1256.
Despite not seeking to introduce the statement under the dying declaration exception, the State argues the merits of this hearsay exception in its brief. We [13find that the statement at issue does not qualify as a dying declaration under La. C.E. art. 804(B)(2)[21] as no foundation was provided that declarant was aware of his imminent demise. State v. Verrett, 419 So.2d 455, 457 (La.1982). In this matter, defendant was in the hospital for five days after the shooting and made the statement a day before his death. There is no evidence that the victim knew of his pending death. Absent the required foundation in the record, admission of this statement in evidence as a dying declaration would constitute manifest error.[22]
*163 The State submits, however, that the statement was properly admitted pursuant to the “police explanation” exception. In support of its position, the State cites State v. Antoine, 02-1068 (La.App. 5 Cir. 2/25/03), 841 So.2d 874, 879-80. In Antoine, this Court recognized that:
A police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. Such statements are admitted not to prove the truth of the assertion, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the officer. State v. Dyer, supra at 12. In State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court explained:
Information about the course of a police investigation is not relevant to any essential elements of the charged crime but such information may be useful to the prosecutor in “drawing the full picture” for the jury. However, the fact than an officer acted on information obtained | Uduring the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant’s guilt that would otherwise be barred by the hearsay rule. Broadway, supra, at 889.
Antoine, supra, 841 So.2d at 880.
The limitation, however, on the “explanation exception” is not applicable here where the statement is part of the ongoing investigation to identify the defendant. In Broadway, the defendant contended that the prosecutor presented hearsay testimony from two police officers that a witness, a co-perpetrator who did not testify at trial, identified the defendant as one of the principals in ' the murder. The officers both testified that they learned of the defendant’s name during the course of their interview with the co-perpetrator. The prosecutor argued that the testimony was being offered to show the sequence of events leading to the defendant’s arrest, and not for the truth of the assertion. The Supreme Court found the testimony that a co-perpetrator had identified defendant by name as a participant in the crime to be inadmissible hearsay.
In the instant matter, we find that Sergeant Spera’s testimony regarding the victim’s description of his shooter was properly admitted under the “explanation” exception to the hearsay rule and was not used as an indirect method of placing before the jury a statement that implicated a *164 specific defendant in the crime as in Broadway. Here, the victim was never able to make an identification of the shooter. Sergeant Spera’s testimony provided a more detailed description but not an identification. We find that this information was part of the ongoing investigation and was relevant to the sequence of events leading to defendant’s subsequent identification and arrest, not as in Broadway an out-of-court identification of a co-perpetrator by a policeman for a. non-testifying defendant. We note that the November 18, 2009 statement was obtained prior to the date 1ir,defendant, Jenkins, and Smith were arrested after fleeing from the black truck that was found to contain the murder weapon in this case.[23]
Additionally, even if the statement should not have been admitted as an exception, we find the trial court did not manifestly error in admitting the statement at issue, the same result as in Broadway. We further find any arguable error by the trial court in permitting Sergeant Spera to testify regarding the victim’s description of the shooter constitutes harmless error. The admission of inadmissible hearsay is subject to a harmless error analysis. State v. Ditcharo, 98-1374 (La. App. 5 Cir. 7/27/99), 739 So.2d 957, 963, writ denied, 99-2551 (La.2/18/00), 754 So.2d 964. The proper inquiry is whether the guilty verdict rendered was surely unattributable to the error. Factors to be considered in making this determination include: 1) the importance of the witness’ testimony, 2) the cumulative nature of the testimony, 3) the existence of corroborating or contradictory evidence regarding the major points of the testimony, 4) the extent of cross-examination permitted, and 5) the overall strength of the State’s case. Id.
Here, the evidence presented at trial established that defendant was found in possession of the gun used to shoot the victim. Deputy Collins testified that after engaging in a high speed chase with defendant and two other individuals, defendant fled' from the vehicle from the front passenger seat where the 9 mm pistol used to shoot the victim was found. Defendant’s cell phone was also recovered from inside the vehicle. A review of his phone records placed defendant in the Tallow Tree area at the time of the shooting. The testimony presented at trial further indicates that defendant attempted to discard his cell phone, which |T fiplaced him at the murder scene, by contacting his girlfriend to retrieve the phone from jail and deliver it to an unknown male at a gas station. Defendant also lied to police regarding his whereabouts on the night of the murder. In his statement to the police, he indicated he was at the Gator Bait bar with Smith on the night of the murder; the bar’s surveillance cameras indicated, however, that he was not there. Additionally, Jenkins, and Swatt both placed defendant at the scene of the shooting. They testified that a white minivan pulled up, defendant approached the driver’s side of the victim’s vehicle to conduct a drug transaction, an *165 argument ensued, and shots were fired. Although Swatt did not see who fired the shots, he did state that he observed defendant at the driver’s side of the van before the shots were fired. Jenkins also testified that defendant fired his 9 mm pistol into the driver’s side window of the victim’s vehicle as the victim attempted to flee. Jenkins further recalled that after the shooting, defendant stated that he “didn’t mean to shoot him [the victim], but that he thinks he shot him.” Carto also testified that he was in the Tallow Tree neighborhood that night, and although he did not see who fired the gunshots, he did observe defendant standing at the driver’s side door of the victim’s vehicle when the shots were fired. Additionally, although Smith denied being at the scene at the time of the shooting, he testified that he knew defendant to have possessed the 9 mm pistol and that defendant had told him the gun was “hot.” In fact, it had been reported as stolen, and had been, in his words, “put to work.”
Accordingly, based on the foregoing cumulative testimony and evidence placing defendant at the scene of the shooting, the identification of defendant by Jenkins as the shooter, Swatt and Carto’s placement of defendant on the driver’s side of the victim’s vehicle at the time the shots were fired, defendant’s possession of the murder weapon, and defendant’s statements regarding the gun, we find that the 117admission of Sergeant Spera’s testimony concerning the victim’s description of the shooter was harmless error, if error at all.
Accordingly, assignment of error number one lacks merit.
In his second assignment of error, defendant argues that the trial court erred in denying his Motion for Mistrial[24] based upon juror Denise Kirts’ testimony regarding juror misconduct. Alternatively, defendant submits that the motion for new trial should be remanded for the taking of additional testimony, including additional testimony from Ms. Kirts, seeking an explanation for the difference between her testimony and what the evidence tends to prove.
In response, the State contends that the trial court did not err in limiting the scope of the motion hearing to preclude questioning concerning the alleged existence of general pre-deliberation discussions between jurors. The State further asserts that this matter should not be remanded for the purpose of recalling Ms. Kirts because her testimony was specifically rebutted by each of the other jurors. Finally, the State maintains that the trial court properly denied defendant’s motion for new trial where defendant failed to establish that an injustice had been done, and further failed to establish a prejudicial error or defect in the proceeding.
After the verdict was rendered in this matter, but prior to sentencing, the trial court received a “Jury Service Exit Questionnaire” completed by juror Denise Kirts, who alleged that: 1) jurors were overheard discussing attempts to find the case on the television or the internet; 2) on the second day of trial, six jurors stated that they could reach a verdict; and 3) an alternate juror discussed the case in the “breakroom.” Following disclosure of the questionnaire, defendant filed a Motion for New Trial and Alternatively to Arrest the Judgment based upon this | ^information. An evidentiary hearing was held on December 3, 2012, January 7, 2013, and *166 March 4, 2013, during which testimony was taken from all the jurors, the alternate jurors, and the bailiff, Deputy Antoine McPherson.
During the evidentiary hearing, the trial court allowed the parties to elicit testimony concerning Ms. Kirts’ allegation that some jurors attempted to obtain extraneous information pertaining to the case from the television or the internet. However, the court prohibited questioning as to the allegations of inter-juror communications or discussion of the case prior to deliberations.[25]
Ms. Kirts testified that although she could not identify the specific jurors, she overheard some of them talking about watching the television “to see if this was, this case — .” Ms. Kirts had her head down when this comment was made; however, upon hearing it, she lifted her head and stated, “It’s not fair that we discuss the case up in here.” She further testified that she overheard one juror say that they tried to find the case on their cell phone, but that they could not find it. Ms. Kirts did not know who made this comment, only that she heard “him say it.” She testified that there was another incident where “maybe about four”[26] white jurors, “maybe about one male and three females,” were talking about “it” during a cigarette break. Ms. Kirts stated that she reported “to the deputy that they were discussing the case in the room” but did not report that some jurors were searching for the case on outside media sources.
With regard to the television and internet search, Ms. Kirts explained in more detail on cross-examination “[tjhat they watched the news, you know” and that a juror stated “it’s not even coming up on the news. I tried to Google it. And, you know, there’s nothing on, online about the case.” She identified the person 11sspeaking as female.[27] She further stated that during the cigarette break, the jurors were discussing the case in general and not talking about trying to find the case on television or the internet.
The other jurors and alternate jurors were then questioned regarding the alleged conversations concerning efforts to research the case. They all testified under oath that they did not recall hearing any conversations regarding the researching of the case in the news or on the internet, nor did they hear Ms. Kirts discuss this matter with the deputy.[28] Deputy McPherson also testified that he did not receive any complaints from Ms. Kirts regarding jurors investigating the case on the internet or television.
On May 30, 2013, the trial court denied defendant’s motion for new trial. In denying defendant’s motion, the trial court reasoned as follows:
The Court has had the opportunity to hold hearings relative to the information that was brought to the Court’s atten *167 tion. The Court alerted both counsel for the State and the Defense as to the allegations that Ms. Kirts made with regard to any alleged improper conduct on the part of the jurors. And based upon the information that this Court received, as I indicated, I provided that information to counsel for both the State and the defendant. And after providing that information, the Court held hearings with each of the jurors that were impaneled in this particular matter to make a determination as to whether any extraneous information was brought to bear in the jury deliberations. And as per those hearings, the Court allowed counsel for each side to conduct interviews with each of the jurors in those matters. And the Court was there present and with the defendant present and observed the testimony of each of the witnesses who denied the allegations that were made by Ms. Kirts. Ms. Kirts again was unclear as to which party or parties had indicated that they had actually engaged in an improper investigation of the facts surrounding the defendant in this matter, and that she was also unclear as to any particulars surrounding this matter. And as such, with the denial of each of the jurors who were brought in and placed under oath and allowed to testify and be examined by each of the counsel and based |g0upon the testimony at that hearing, the Court’s going to deny Counsel’s motion.
The denial of a motion for new trial is not subject to appellate review except for an error of law. La.C.Cr.P. art. 858. Further, the ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of that discretion. State v. Gerard, 96-366 (La.App. 5 Cir. 11/14/96), 685 So.2d 253, 260. The merits of a motion for new trial must be viewed with extreme caution in the interest of preserving the finality of judgments. State v. Rodriguez, 02-334 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 133, writ denied, 03-0482 (La.5/30/03), 845 So.2d 1061, cert. denied, 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003).
Louisiana’s jury shield provision, codified in La. C.E. art. 606(B), generally precludes inquiry into the course and conduct of a jury’s deliberations. State v. Ingram, 10-2274, p. 5 (La.3/25/11), 57 So.3d 299, 301. It provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury’s attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (Emphasis added).
The prohibition provided in La. C.E. art. 606(B) is intended to preserve the confidentiality and finality of jury verdicts and the confidentiality of the jurors’ discussions. State v. Videau, 04-923 (La.App. 5 Cir. 3/1/05), 900 So.2d 855, 863, unit denied, 05-0841 (La.1/9/06), 918 So.2d 1037. However, as the emphasized language makes clear, the prohibition against juror testimony is not absolute but must yield to a substantial showing that the defendant was deprived of his *168 | „ constitutional rights. Id. Thus, this exception allows jurors to testify as to whether any outside influence was improperly brought to bear on their deliberations. State v. Rodriguez, 97-501, p. 6 (La.App. 5 Cir. 11/25/97), 703 So.2d 803, 806, writ denied, 98-0449 (La.6/26/98), 719 So.2d 1055 (citation omitted).
An evidentiary hearing at which jurors shall testify is required when there are well-pleaded allegations of prejudicial juror misconduct violating the defendant’s constitutional rights. A juror should not consider facts relating to the case unless such facts were introduced at trial under both constitutional and legal safeguards. State v. Weaver, 05-169, p. 20 (La.App. 5 Cir. 11/29/05), 917 So.2d 600, 613, unit denied, 06-0695 (La.12/15/06), 944 So.2d 1277 (citing State v. Johnson, 34,902 (La. App. 2 Cir. 9/26/01), 796 So.2d 201, 211, writ denied, 03-2631 (La.11/8/04), 885 So.2d 1124).
Finding well-pleaded allegations of prejudicial juror misconduct in this case, the trial court held an evidentiary hearing during which all the jurors, the alternate jurors, and the bailiff testified. During the hearing, the trial court correctly limited the scope of the questioning to Ms. Kirts’ allegations regarding the researching of the case on the internet and television. The remainder of Ms. Kirts’ allegations of juror misconduct concerned the alleged existence of general pre-delib-eration discussions between jurors, which do not fall within the exception to the juror shield law set forth in La. C.E. art. 607(B). Pre-deliberation discussions among jurors, including the alternates, although in violation of the trial court’s instruction, do not amount to “outside influence” or “extraneous” information.[29] Weaver, supra at 613 (citing State v. Home, 28,327 (La.App. 2 Cir. 8/21/96), 679 So.2d 953, 956, writ denied, 96-2345 (La.2/21/97), 688 So.2d 521). Accordingly, we find that any alleged intra-jury communications, if they took place, were not improper outside influences, extraneous prejudicial information, or objectively verifiable misconduct, and thus, were properly limited during examination of the jurors.
Likewise, defendant’s argument that a new trial should have been granted based on Ms. Kirts’ allegation that jurors were overheard discussing attempts to find the case on the television or internet lacks merit.
Defendant concedes that based on the testimony of the bailiff and all of jurors, excepting Ms. Kirts, proof of extraneous influence is lacking. Although Ms. Kirts testified that she overheard some jurors discussing an attempt to locate the case on television and the internet, she was unable to identify the juror or jurors who made these comments. She further confirmed that while alleged attempts were made to gain additional outside information from media sources, the search for this information was unsuccessful. Moreover, her testimony was specifically rebutted by the testimony of the other jurors and alternate jurors, as well as the bailiff who confirmed that Ms. Kirts did not contact him regarding the alleged improper research discussions. In rendering its ruling, the trial *169 court noted that “Ms. Kirts again was unclear as to which party or parties had indicated that they had actually engaged in an improper investigation of the facts surrounding [ ] defendant in this matter, and that she was also unclear as to any particulars surrounding this matter.” Thus, despite defendant’s contention that the stark contrast between Ms. Kirts’ testimony and the 14 other witnesses warrants remand for the taking of additional testimony, it is unclear how any further testimony would be beneficial.
Considering the discretion of the trial court, and the jurors’ overwhelming denials concerning the search for extraneous information pertaining to this case, |¡>awe find that the trial court properly denied defendant’s motion for new trial premised on juror misconduct.
Accordingly, assignment of error number two lacks merit.

ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990).

Error No. 1:

The record reveals that the trial judge did not observe the mandatory 24-hour delay between the denial of defendant’s motion for a new trial and sentencing, as required by La.C.Cr.P. art. 873.[30] The trial judge denied defendant’s motion for a new trial based on sufficiency grounds on June 17, 2013, and imposed sentence on defendant that same day.[31]
When a defendant challenges the penalty imposed and the imposed sentence is not mandatory, the failure to observe the 24-hour delay mandated in La. C.Cr.P. art. 873 cannot be considered harmless error. State v. Nicholas, 10-866, pp. 10-11 (La.App. 5 Cir. 5/24/11), 67 So.3d 610, 617. As a general rule, when a defendant challenges a non-mandatory sentence and the delay is not waived, the defendant’s sentence must be vacated and the matter remanded for re-sentencing. Id. In the present case, the imposed sentence was not mandatory. However, defendant is not challenging his sentence on appeal.
| ?/tHere, defendant did not expressly waive the mandatory statutory delay between the trial judge’s ruling on his motion for new trial and his sentencing. However, defendant did not object to proceeding with sentencing or raise the trial judge’s failure to observe the delay as error. Further, the record suggests that defendant knew that he would be sen *170 tenced and apparently was prepared for sentencing as evidenced by defense counsel’s argument to the court that a lenient sentence should be imposed based on certain mitigating factors. As such, even if defendant did not waive the delay, we find that defendant was not prejudiced by the trial court’s failure to observe the delays and that “remand would be a useless formality.” See State v. Johnson, 11-375, p. 9 (La.App. 5 Cir. 12/28/11), 83 So.3d 1116, writ denied, 12-0296 (La.6/22/12), 91 So.3d 966. Absent a showing of prejudice from the failure to afford the statutory delay, reversal of a prematurely-imposed sentence is not required. State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
Also, although defendant did not expressly waive the mandatory sentencing delay, we find that defendant tacitly waived the delay by proceeding with argument regarding sentencing. See State v. Jackson, 04-293, pp. 9-10 (La.App. 5 Cir. 7/27/04), 880 So.2d 69, 75, writ denied, 05-0232 (La.5/6/05), 901 So.2d 1094, where this Court found that although the defendant did not expressly waive the 24-hour delay, he tacitly waived the delay by proceeding with argument regarding sentencing after objecting to the denial of the motion for new trial. Further, the Louisiana Third Circuit Court of Appeal has found an implied waiver of La.C.Cr.P. art. 873 in situations where defense counsel voiced no objection when sentencing is taken up immediately after a denial of a post-trial motion. In State v. Giles, 04-359, pp. 27-29 (La.App. 3 Cir. 10/6/04), 884 So.2d 1233, 1251-52, writ denied, 04-2756 (La.3/11/05), 896 So.2d 62, the court held that there was an implied waiver when counsel did not object to the immediate sentencing after the denial of the motion for post-verdict judgment of acquittal, argued for a lenient sentence, and filed letters submitted on the defendant’s behalf. The court also noted that the defendant did not make a claim of prejudice because of the failure to abide by the delay. In State v. Taves, 02-709 (La.App. 3 Cir. 1/15/03), 846 So.2d l,[32] the court held that there was an implied waiver after noting that defense counsel failed to voice an objection even though he was clearly aware that the sentencing was scheduled for the same date as the motion for new trial, that defense counsel presented evidence at the hearing and made arguments concerning his sentence, and that defense counsel did not raise the lack of delay as error or allege prejudice. However, although the Taves court found that there was an implied waiver of the Article 873 delay, the court found the sentences were excessive and remanded the case for re-sentencing.
Based on the foregoing, we find that corrective action on this error is not necessary.

Error No. 2:

Although the commitment reflects that defendant was given a proper advisal of the time period for seeking post-conviction relief as required by La.C.Cr.P. art. 930.8, the transcript indicates that the trial court failed to provide such an advisal. The transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).
*171 It is well settled that if a trial court fails to advise, or provides an incomplete advi-sal, pursuant to La.C.Cr.P. art. 930.8, the appellate court may correct this error l^by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030; State v. Taylor, 12-25 (La.App. 5 Cir. 6/28/12), 97 So.3d 522, 538; State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, writ denied, 11-1753 (La.2/10/12), 80 So.3d 468; State v. Neely, 08-707, p. 9 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied, 09-248 (La.10/30/09), 21 So.3d 272; State v. Davenport, 08-463, pp. 10-11 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied, 09-158 (La.10/16/09), 19 So.3d 473.
Accordingly, we now advise defendant by way of this opinion that no application for post-conviction relief, including applications which seek an out-of time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922.

DECREE

In light of the foregoing reasons, defendant’s conviction and sentence are affirmed.

AFFIRMED.

WICKER, J., concurs with reasons.

. On the same date, co-defendants Antoine Jenkins and Jeremy Mims were also indicted for the second degree murder of Joey Bullock.
On June 20, 2012, the State entered a nolle prosequi on the second degree murder charge brought against Jenkins and further amended the bill of indictment to charge Jenkins with .one count of obstruction of justice (La. R.S. 14:130.1) and one count of aggravated flight from an officer (La. R.S. 14:108.1(C)). On July 10, 2012, the State entered a nolle prose-qui on Jenkins’ charge of aggravated flight from an officer.
Additionally, according to a motion in li-mine filed by the State on September 18, 2012, the second degree murder indictment against Mims was dismissed by the State on August 16, 2012.

. Jenkins was charged along with defendant with two counts of possession of a firearm while in possession of a controlled dangerous

. See Errors Patent discussion regarding the failure to observe the requisite 24-hour delay.

. The victim’s vehicle had crashed into another vehicle in front of an apartment complex.

. Aischa Prudhomme, expert in the field of latent fingerprint analysis, was unable to match defendant’s fingerprints to those found on the victim’s vehicle.

. Deputy Purcell accompanied the victim during his transport to the hospital. He provided her with his personal identification information and also informed her that he was shot by a black male when he was in the Tallow Tree area attempting to buy cocaine.

. While at the scene, Sergeant Monie spoke with the victim’s cousin, Ken Mayeaux, who informed him that the victim dropped him off at the entrance to the Tallow Tree neighborhood prior to this incident, and that he was not present when the shooting occurred. The victim confirmed that Mayeaux was not with him when he was shot.

. Dr. Garcia clarified that she had to classify the cause of death as a “distant” range gunshot wound because she was unable to determine how far away the weapon was when it was fired, due to the fact that the victim was presented to her several days after he was shot.

. Nancy Webber, custodian of records for the emergency calls received by the Jefferson Parish Sheriff's Office, confirmed that on November 21, 2009, a call came in from a residence located at 1061 Tallow Tree Lane. The 911 tape was played for the jury.

. Sergeant Donald Dubroc, of the Jefferson Parish Sheriff's Office, testified that he assisted in the pursuit of the two fleeing subjects. Sergeant Dubroc observed defendant and Jenkins hiding near the Crescent City Connection bridge. The two men attempted to flee when Sergeant Dubroc approached their location but were eventually apprehended. A pill bottle containing crack cocaine was located on the ground between the two men when they were apprehended.

. A picture of defendant taken at the time of his arrest was introduced into evidence as State’s Exhibit 77.

. Thomas Koch, records custodian for Sprint Nextel, testified that Ms. Eames' phone records indicated that from October 1, 2009, *159 to November 30, 2009, 194 calls were made to defendant's phone. The last incoming call made from defendant’s phone was received on November 21, 2009 at 2:25 p.m.

. Ms. Riley, who recognized defendant as an occasional customer of the bar, confirmed that defendant had not been in her bar on the night of the shooting.

. Ms. Craft testified that she was "talking” to Jenkins for about a year. According to Ms. Craft, Jenkins did not have a cell phone so he would usually speak with her from his house phone. Ms. Craft testified that she had spoken to Jenkins from a different phone number (which she recalled started with the number eight) on and off on November 13, 2009 — the night of the shooting.

. Defendant’s cell phone records confirmed this. Specifically, on the cell phone records attributed to defendant's number (896-0144), Ms. Craft's phone number appeared 22 times between 10:51 p.m. on November 13, 2009, and 3:53 a.m. on November 14, 2009.

. Kerry Swatt was located and interviewed by Sergeant Decker. Swatt confirmed that defendant, Mims, Jenkins, and Carto were all at the scene of the shooting that night.

. Carto refused to testify at trial.

. Jenkins, defendant, and Smith used the black Nissan truck — that was stopped a week later — to drive to the Tallow Tree area.

. Jenkins testified that he did not own a cell phone at that time and that he would use defendant’s phone to make calls.

. Swatt testified that he did not know Smith and could not say whether he was at the scene that night.

. La. C.E. art. 804 provides in pertinent part:
(B) The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (2) Statement under belief of impending death. A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

. Notably, the State did not seek to introduce the victim's description of the shooter under the dying declaration exception. Nonetheless, we find that the victim's description of the shooter does not fall within the *163 dying declaration exception to the hearsay rule.
A dying declaration is defined as "[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.” La. C.E. art. 804(B)(2). A statement is admissible as a dying declaration if it is made when the declarant is conscious of his condition and aware of his approaching demise. Verrett, 419 So.2d at 457.
The victim need not express his awareness of his demise in direct terms, but rather the necessary state of mind may be inferred from the facts and circumstances surrounding the making of the declaration. Id.; State v. Bell, 97-896, p. 2 (La.App. 5 Cir. 10/14/98), 721 So.2d 38, 40, writs denied, 98-2875 and 98-2890 (La.3/12/99), 738 So.2d 1085.
Here, the victim was shot on November 14, 2009, interviewed on November 18, 2009, and died on November 19, 2009. Although the victim died the day following his statement, there was no testimony presented regarding the victim's belief that his death was imminent, or that he was conscious of his condition and aware of his approaching demise. The victim’s health status at the time of his statement is unknown from the record. Accordingly, we find that the victim's description of the shooter does not constitute a dying declaration.

. Of note, it is well established that the appellate court is not limited to the evidence adduced at the pre-trial hearing but may also consider the evidence presented at trial in determining whether the trial court’s ruling on a motion to suppress is correct. State v. Morton, 08-164, p. 6 (La.App. 5 Cir. 7/29/08), 993 So.2d 651, 656. In State v. Banks, 96-652, p. 6 (La.App. 5 Cir. 1/15/97), 694 So.2d 401, 406 n. 2, this Court applied the same rationale when reviewing the trial court's ruling on a motion to quash. See also State v. Roblow, 623 So.2d 51, 55 (La.App. 1 Cir. 1993). Although there do not appear to be any cases extending this same rule to the review of a ruling on the admissibility of a dying declaration, there does not appear to be any reason why the same rationale should not apply.

. It is noted that defendant misidentifies the motion he is seeking relief from in his assignment of error heading. It was in fact a motion for new trial premised upon juror misconduct that defendant argues was improperly denied by the trial court and not a motion for mistrial.

. The trial court reasoned as follows: "the Court feels that the question does not ask of anything that may be extraneous.... Even though they may have had discussions, those matters may be subject to a matter for contempt, not for a fact-finding jury to testify to."

. One of the jurors in this alleged discussion group was an alternate.

. She testified that if all the female jurors were brought in to the room, she would not be able to identify the person who made this comment because her head was down when it was said.

.The following jurors and alternate jurors testified: Patricia Brooks Brown; Pamela Gomez; Lisa C. Richardson; William A. Evans, Jr.; Amee Dave; Carolyn M. Pickney; Brian Grant Lade; Irma P. Sardenga; Joelle M. Buzbee; Lori A. Powers-Alternate Juror; Adele H. Ledet-Alternate Juror; Galo Yepez; and Elizabeth Applewhite.

. Notably, participation by alternates in deliberations is an extraneous influence on the jury representing a prima facie case of prejudice requiring reversal. State v. Barber, 97-2749 (La.4/24/98), 708 So.2d 1054. However, in the present case, it is not alleged that the alternate juror participated in jury deliberations in the deliberation room. In fact, the record reflects that after the jury instructions were read, the trial court instructed the two alternate jurors to remain seated when the jurors left court to commence their deliberations.

. La.C.Cr.P. art. 873 provides as follows:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

. It is noted that on October 17, 2012, defendant filed a Motion for New Trial and Alternatively to Arrest the Judgment. In his motion, defendant argued that a new trial should be granted for two reasons: 1) juror misconduct; and 2) the State’s failure to present sufficient evidence at trial, rendering the guilty verdict contrary to the law and the evidence. The trial court held a hearing on defendant's motion for new trial premised on juror misconduct and denied his motion on that basis on May 30, 2013. He did not rule on the motion for new trial on the second basis. On June 17, 2013, prior to sentencing, defense counsel re-urged his motion for new trial based on juror misconduct and also on the basis that the testimony presented at trial was insufficient to support the defendant’s conviction. The trial judge denied defendant’s motion on both grounds and proceeded with sentencing.

. A writ was granted in the matter by the Louisiana Supreme Court. See State v. Taves, 03-518 (La.6/6/03), 845 So.2d 1074. The Taves decision was affirmed in part and reversed in part by the Supreme Court in State v. Taves, 02-518 (La.12/3/03), 861 So.2d 144 (per curiam). The Supreme Court reinstated the defendant’s sentences, and the case was remanded to the trial court for execution of the sentences.