845 So.2d 1116 (2003)
STATE of Louisiana
v.
Larry SIMS.
No. 02-KA-1244.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2003.
*1118 Paul D. Connick, Jr., District Attorney, Alan D. Alario, II, Terry M. Boudreaux, Assistant District Attorneys, Gretna, LA, for Appellee.
Holli Herrle-Castillo, Marrero, LA, for Appellant.
Panel composed of Judges SOL GOTHARD, MARION F. EDWARDS and SUSAN M. CHEHARDY.
MARION F. EDWARDS, Judge.
Defendant, Larry Sims, appeals his conviction for four counts of armed robbery. For the following reasons, we affirm and remand the matter for resentencing.
Defendant, Larry Sims, was charged in a bill of information on November 3, 2000 with four counts of armed robbery in violation of LSA-R.S. 14:64. Sims pled not guilty and filed several pre-trial motions including motions to suppress the evidence and his two statements. A hearing was held on Sims' motions to suppress the evidence and his statements, and the trial court granted the motion to suppress Sims' last statement but denied the motion to suppress the evidence and his first two statements.
Sims proceeded to trial on May 7, 2002, and was found guilty as charged on all four counts. He was sentenced to 99 years without the benefit of parole, probation, or suspension of sentence on each count, with each count to run concurrently.
The State subsequently filed a multiple offender bill of information alleging Sims to be a multiple offender based on count one and two 1996 guilty pleas for distribution of cocaine and aggravated battery. A multiple bill hearing was held and the trial court found Sims to be a second felony offender. The trial court vacated Sims' original 99-year sentence on count one and resentenced him to 110 years without benefits and ordered his enhanced sentence to run concurrently with the sentences defendant was presently serving. Sims presently appeals both his conviction and sentence.
On October 19, 2000 at approximately 9:30 a.m., two men wearing hooded sweatshirts entered the Hibernia Bank at the intersection of Medical Center Blvd. and the Westbank Expressway armed with guns and ordered everyone to lie on the floor. The shorter of the two men, later identified as Sims, remained in the lobby while the taller man, identified by Sims as Floyd Falkins, jumped the teller counter. While behind the teller counter, Falkins put his gun to two of the tellers' heads. He told one of the four tellers, Betty Higgins, to shut up or he would shoot her. Falkins proceeded to take approximately $15,800 from the tellers' drawers. The perpetrators then fled the bank. None of the bank employees could identify the robbers because Sims covered his face with a red bandanna and Falkins covered his face with a black ski mask.
Meanwhile, Sylvia Bourg was sitting in the parking lot of the Hibernia Bank waiting for her daughter to cash a check inside the bank. Thinking it was taking her daughter longer than it should, Ms. Bourg exited her vehicle and walked toward the bank. Two black men wearing hooded *1119 sweatshirts exited the bank carrying a bag and crossed the street. Ms. Bourg noted it was too warm for the men to be wearing sweatshirts. She then saw red smoke coming out of the bag and realized what had happened. Ms. Bourg last saw the men in front of the Rite Aid store. She could not see their faces because they were wearing hoods.
At the same time, Jeanne Pierre was sitting in the Rite Aid parking lot when she saw a man, who was being followed by another man, throw "smoke" into a bush. The men were wearing hooded sweatshirts. One man was carrying a mask in his hand and the other man had a gun that he was tucking into his pants. Ms. Pierre saw the two men enter a burgundy Maxima that was parked in the parking lot and was driven by a third man. The Maxima drove off on the Westbank Expressway toward the Harvey Tunnel but Ms. Pierre managed to get the license plate number which she gave to the police.
Deputy George Giron heard the description of the vehicle over the police radio. He proceeded to the high rise portion of the expressway to see if he could spot the vehicle. A vehicle matching the description passed and he stopped the vehicle. Deputy Giron ordered the driver out of the vehicle and the driver complied. He then ordered the driver to the rear of the vehicle at which time the driver jumped off the high-rise. The two passengers, Sims and Falkins, were immediately taken into custody. The officer observed a weapon protruding from under the front passenger seat and a dye-stained sweatshirt, gloves and bag in the rear of the car. A search warrant was obtained for the car and yielded a semi-automatic black handgun and a .357 magnum revolver, which the victims identified as being the guns used during the bank robbery, bullets, a black knit ski mask, a red bandanna, a black nylon bag, $15,839.00, three security dye packs, and a blue/gray hooded sweatshirt.
After his arrest, Sims was advised of his rights. He waived his rights and gave an oral statement to Sergeant Grey Thurman. In his statement, Sims admitted his involvement in the bank robbery. He stated he armed himself with a semi-automatic gun, entered the bank, and ordered the people in the bank to lie down. He explained he stayed in the lobby while Falkins took the money. He then stated they left the bank in a car driven by his brother, Dwayne Sims.
In his first assignment of error, Sims argues the oral statement given to Sgt. Thurman should have been suppressed because he did not understand his rights when he signed the waiver of rights form. Sims contends his statement was not voluntary, instead asserting that he was confused about his rights, as indicated by his subsequent taped statement when he stated he wanted an attorney. Sims points out he does not read well and that he is a schizophrenic.
Prior to trial, Sims filed a generic motion to suppress all his statements on the basis they were involuntary. A hearing was held which revealed defendant gave three statements to Sgt. Thurman. Sims first gave an unrecorded oral statement and then two subsequent taped statements.
Before talking with Sims, Sgt. Thurman reviewed a Rights of Arrestee or Suspect form with him. Defendant indicated he had difficulty reading so Sgt. Thurman read the form aloud using his finger to follow along the words on the form. Sims initialed each right and then signed in two places indicating he read and understood his rights and that he wished to waive his rights. Sgt. Thurman knew defendant from a prior homicide case where defendant was a witness and felt Sims was *1120 capable of understanding and did in fact understand the rights he was waiving. Thereafter, Sgt. Thurman and defendant discussed the incident at which time Sims conveyed the story of what happened. This statement was not recorded.
Sgt. Thurman then obtained a tape recorder and began taking a recorded statement. At the beginning of the first taped statement, Sgt. Thurman again reviewed Sims' rights and referenced the waiver of rights form, which Sims had previously executed. When Sims was asked whether he understood everything on the waiver of rights form, he responded by inquiring into his right to an attorney. Sims then stated he was confused and that he wanted an attorney present.
Sgt. Thurman asked if Sims was confused prior to that point and defendant replied in the negative. Sims stated he was confused now because he was getting sleepy and his medication was making him drowsy. Sgt. Thurman then asked Sims if he had understood the waiver of rights form 30 minutes earlier when he signed it and Sims indicated that he did. Sims admitted he did not request an attorney when he signed the waiver of rights form and had not requested an attorney prior to the instant moment. He acknowledged that he had given Sgt. Thurman a statement after signing the waiver of rights form and before the present recorded statement. Thereafter, despite having asked twice for an attorney, Sims stated he wanted to "go ahead" and talk but Sgt. Thurman concluded the statement. Ten minutes later, Sims gave a second recorded statement at the beginning of which Sgt. Thurman again reviewed defendant's rights. This second recorded statement contained substantive facts regarding the incident.
The trial court granted the motion to suppress any statement given after Sims stated he wanted an attorney present, which occurred on page six of his first recorded statement, and denied the motion to suppress any statement given prior to that point. Thus, the trial court ruled Sims' unrecorded oral statement and his first recorded statement were admissible and his second recorded statement was inadmissible. In finding Sims' first two statements admissible, the trial court reasoned that the written wavier of rights was valid and well-executed and that defendant's waiver of rights at that time was voluntary and knowing.
The State contends that Sims failed to preserve his right to appeal the trial court's ruling on his motion to suppress his statements because defendant failed to object to the trial court's ruling. However, LSA-C.Cr.P. art. 841(B) patently states that no objection is required to a ruling on a written motion in order to permit the ruling to be considered on appeal.[1]
Before an inculpatory statement, made during a custodial interrogation, may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[2] rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises.[3] A determination *1121 of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation.[4]
The admissibility of a confession or statement is a determination for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.[5] In reviewing the trial court's ruling, the evidence presented at trial may be considered in addition to the evidence presented at the hearing on the motion to suppress.[6]
Sims does not allege that he was not advised of his Miranda rights but rather that he did not knowingly waive them. The record shows Sgt. Thurman adequately reviewed defendant's rights prior to interviewing him. Sgt. Thurman was aware Sims had difficulty reading and took care to read the form to defendant. Sgt. Thurman knew defendant from a prior homicide case where Sims was a witness. He stated that in connection with the homicide case, he spoke to Sims at length on numerous occasions. Based on his prior experiences with defendant, Sgt. Thurman believed Sims understood his rights. Sgt. Thurman specifically noted defendant appeared of a "normal nature" and did not appear drugged or drunk.
These facts support the trial court's conclusion that defendant knowingly waived his rights prior to speaking with Sgt. Thurman and giving an unrecorded statement. Additionally, by his own statement, Sims admits he understood his rights at the time he initially waived them. He admitted he did not request an attorney at that time and that he gave an unrecorded statement to Sgt. Thurman. There is nothing in the record that indicates defendant did not understand his rights when he initially waived them or that he was coerced into giving an unrecorded statement. This assignment is without merit.
In his second assignment of error, Sims asserts his 110-year enhanced sentence and three 99-year concurrent sentences are excessive. He contends the trial court failed to consider mitigating factors such as the fact no one was injured, no shots were fired, defendant was not the "leader" of the crime, and defendant's history of mental disorders. Sims further argues he had only a "slight" criminal history for a 46-year-old man which does not justify an effective life sentence.
Because of an error patent that requires the three 99-year sentences to be vacated, we will only address the excessiveness of defendant's enhanced 110-year sentence.
Both the United States and the Louisiana Constitution prohibit the imposition of excessive or cruel punishment.[7] A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering.[8] Trial judges are granted great discretion in imposing sentences and sentences will not be set aside as excessive absent clear abuse of that broad discretion.[9]
*1122 In reviewing a sentence for excessiveness, this Court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock our sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing sentence.[10] The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.[11] In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.[12]
Sims was convicted of four counts of armed robbery. As a second felony offender, defendant faced an enhanced sentencing range on count one between 49½ years and 198 years.[13] Sims received 110 years which is in the mid-range.
Higher sentences for a second felony offender where the predicate offense is armed robbery have been upheld.[14] Armed robbery is a serious offense against the person. In this case we note that Sims, age 46, and his accomplice placed the bank employees as well as the bank customers in fear of their lives. The employees and customers were made to lie on the floor at gunpoint. Two of the victims had a gun held to their head and at least one of the victims was expressly threatened with her life. Sims had two prior convictions including one for aggravated battery, another violent offense against the person. Based on these facts, we find that the trial court did not abuse its discretion in sentencing defendant to the mid-range of 110 years as a second felony offender. This assignment is without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[15] and State v. Weiland.[16] The review reveals two errors patent in this case.
The trial court sentenced defendant immediately after denying his motion for new trial and motion for post verdict judgment of acquittal. LSA-C.Cr.P. art. 873 requires a 24-hour delay in sentencing after denial of a motion for new trial or in arrest of judgment, unless the defendant waives the delay. The record shows that defendant did not waive this delay. As a general rule, when a defendant challenges a non-mandatory sentence, and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing. However, when the original sentence is set aside at a multiple offender proceeding, the failure to observe the 24-hour delay is harmless.[17]
Sims' original sentence on count one was vacated at the multiple offender proceeding. Thus, as to count one, the *1123 failure to observe the 24-hour delay was harmless. However, because defendant challenges his remaining three non-mandatory 99-year sentences as excessive, his sentences on counts two, three and four are hereby vacated and we remand the matter for resentencing.[18]
We also note that Sims' motion for appeal was premature when it was filed after conviction and sentence but before sentencing as a multiple offender. However, this procedural defect was cured by the subsequent re-sentencing of defendant as a multiple offender.[19]
Accordingly, based on the foregoing, the defendant's conviction is affirmed, and we remand for resentencing.
AFFIRMED; REMANDED.
NOTES
[1] See also, State v. Stripling, 354 So.2d 1297, 1301 (La.1978).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] LSA-R.S. 15:451; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 29, cert. denied. 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780, writ denied, 00-3137 (La.11/2/01), 800 So.2d 866;
[4] State v. Quest, supra at 780.
[5] Id.
[6] State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179, 1182.
[7] U.S. Const. amend. VIII; La. Const. of 1974, Art. I, § 20.
[8] State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[9] State v. Bacuzzi, 97-573 (La.App. 5 Cir. 1/27/98), 708 So.2d 1065, 1068-1069.
[10] State v. Brown, 99-172 (La.App. 5 Cir. 9/28/99), 742 So.2d 1051, 1056, writ denied, 99-3148 (La.4/20/00), 760 So.2d 340.
[11] State v. Watts, 99-311 (La.App. 5 Cir. 8/31/99), 746 So.2d 58, 64, writ denied, 99-2733 (La.3/24/00), 758 So.2d 145.
[12] Id.
[13] LSA-R.S. 15:529.1.
[14] In State v. Jackson, 96-661 (La.App. 5 Cir. 4/9/97), 694 So.2d 440, 451, writs denied, 97-1050 (La.10/13/97), 703 So.2d 609, and 97-1255 (La.10/13/97), 703 So.2d 612, this Court upheld defendant's 198-year enhanced sentence on an armed robbery conviction as a second felony offender.
[15] 312 So.2d 337 (La.1975).
[16] 556 So.2d 175 (La.App. 5 Cir.1990).
[17] State v. Parker, 01-0958 (La.App. 5 Cir. 2/13/02), 812 So.2d 86, 91.
[18] See, State v. Brown, 01-41 (La.App. 5 Cir. 5/30/01), 788 So.2d 694, 705.
[19] See, State v. Odoms, 01-1033 (La.App. 5 Cir. 3/26/02), 815 So.2d 224, 226, fn. 1, writ denied, 02-1185 (La.11/22/02), 829 So.2d 1037.