STATE OF LOUISIANA

VERSUS

SHINEDA N. TAYLOR

NO. 20-KA-215

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-1692, DIVISION "N"
HONORABLE STEPHEN D. ENRIGHT, JR., JUDGE PRESIDING


April 28, 2021


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Robert A. Chaisson, and John J. Molaison, Jr.


**<u>AFFIRMED</u>**
    **FHW**
    **RAC**
    **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Matthew R. Clauss
 Lynn Schiffman
 John Carr

COUNSEL FOR DEFENDANT/APPELLANT,
SHINEDA N. TAYLOR
 Bruce G. Whittaker

**WICKER, J.**

Defendant, Shineda N. Taylor, appeals her conviction for unauthorized use of a motor vehicle, a violation of La. R.S. 14:68.4.[1]   She assigns as error the insufficiency of the evidence to convict her.  For the reasons that follow, we affirm Defendant's conviction and sentence.

The Jefferson Parish District Attorney filed a bill of information on March 21, 2019, charging Ms. Taylor with unauthorized use of a motor vehicle, in violation of La. R.S. 14:68.4.  Defendant was arraigned on March 26, 2019, and pled not guilty.[2] On January 13, 2020, the District Attorney filed a superseding bill of information charging Defendant with unauthorized use of a motor vehicle, in violation of La. R.S. 14:68.4 (count one) and simple kidnapping, in violation of La. R.S. 14:45 (count two).  Defendant was arraigned on the superseding bill of information on January 27, 2020, and pled not guilty.  Trial was held before a six-member jury on January 28, 2020.

The testimony at trial revealed the following.  Ms. Saundra Katz has owned a small auto dealership, Boomtown Auto Sales ("Boomtown"), for approximately twenty years.  Boomtown is located on Airline Drive in Kenner, Louisiana between

---

[1] In her February 7, 2020 motion for appeal, Defendant sought appeal from the "final judgment entered by this court on February 6, 2020," which was the date of sentencing.  Defendant did not specifically seek to appeal her January 28, 2020 conviction.  Nevertheless, Defendant's sole assignment of error pertains to her conviction and not her sentence.  Appeals are favored in law, and appeals should not be dismissed on hypertechnical interpretations of a statute which can be reasonably interpreted to preserve the appeal, particularly in the absence of any claim of prejudice by the opposing party.  *State v. Armant*, 02-907 (La App. 5 Cir. 01/28/03), 839 So.2d 271, 274.  Accordingly, Defendant's assignment of error is addressed herein, and a full error patent review will be performed.  *See State v. Luckey*, 16-494 (La. App. 5 Cir. 2/8/17), 212 So.3d 1220, 1224, *writs denied*, 17-432 (La. 10/27/17), 228 So.3d 1225 and 17-617 (La. 10/27/17), 228 So.3d 1234 (Wherein the defendant filed a notice of appeal from the final judgment entered on the date of the defendant's sentencing.  This Court, pointing out that although the defendant did not explicitly seek review of his convictions in his notice of appeal, his sole counseled assignment of error and his three *pro se* assignments or error pertained only to his convictions, not to his sentences.  This Court, therefore, addressed defendant's assignments of error concerning his convictions and conducted a full errors patent review); *see also State v. Raymo*, 81-3151 (La. 09/07/82), 419 So.2d 858, 861 (sufficiency of the evidence should be considered, regardless of how the error is brought to the attention of the reviewing court, and since the double jeopardy clause prevents retrial when a reversal is based on insufficiency of evidence due to the State's failure to prove an essential element of the offense, a judgment of acquittal must be entered).

[2] The State amended the bill of information on November 14, 2019, to add "AKA Shineda T. Diaz."

Fairway Street and Tyler Street.[3] Ms. Katz testified that Ms. Paulette Elwood, Boomtown's secretary, and Ms. Barbara Tyler had worked with her for a "very long time." Ms. Tyler's cousin also worked as a salesperson at Boomtown.[4]

As of May, 2018, Ms. Tyler had been working at Boomtown as a salesperson for about seven or eight years. Her job duties included, *inter alia*, selling vehicles and conducting test drives with potential customers. She testified that, when she conducted test drives, she directed potential customers to follow a particular route. The normal test drive route took the customer/driver "out up Airline, down Williams, and back around up through Roosevelt." Ms. Katz confirmed that Boomtown maintains a designated route for test drives and that, for insurance and safety purposes, the designated route does not involve entering onto the interstate. Ms. Katz testified that she never had an issue with a potential customer demanding to take a vehicle onto the interstate prior to this incident.

On the day in question, May 7, 2018, Ms. Tyler testified that she was taking her lunch break in the back of the dealership when she received an overhead page that there was a customer in need of assistance on the sales floor. Ms. Tyler responded to the request and identified the customer as Defendant. Ms. Tyler testified that Defendant had a positive demeanor when she first encountered her; "nothing out of the order." She testified that Defendant arrived with a purse and a backpack.[5] Ms. Tyler testified that, after Ms. Elwood made a photocopy of Defendant's license,[6] she—Ms. Tyler—accompanied Defendant on a test drive of a white, 2006 Lexus.[7]

---

[3] Ms. Barbara Tyler testified that Boomtown was located off of Airline, and she identified its location on a Google Earth Map.

[4] The trial transcript refers to Ms. Tyler's cousin both as Ramon Murray and Raymond Nunnery; it remains unclear which name and/or spelling is correct.

[5] Ms. Tyler testified that she did not know how Defendant arrived at Boomtown, nor did she know whether, after the conclusion of the test drive, Ms. Tyler ever returned to Boomtown to pick up a vehicle.

[6] Both Ms. Katz and Ms. Elwood respectively testified that a photocopy of Defendant's license was made on May 7, 2018, prior to the commencement of the test drive. A copy of Defendant's license, which Ms. Elwood identified as the copy she had made on May 7, 2018, was entered into evidence.

[7] Images of the vehicle test driven, as identified by Ms. Tyler, were entered into evidence.

Ms. Tyler testified that after leaving Boomtown, they got onto Airline, traveled down Williams, and headed in the direction of the interstate. As they neared the interstate, Defendant asked Ms. Tyler if they could drive on the interstate. Ms. Tyler testified that she explained that Defendant could not drive onto the interstate because of insurance reasons. Ms. Tyler testified that after Defendant asked, "what could [she] do," she called her boss, Ms. Katz, who also told Defendant that they could not get on the interstate because the insurance did not "go that far." Ms. Tyler testified that while Defendant was talking to Ms. Katz, Defendant turned away from the interstate, onto Veterans Memorial Boulevard, seemingly headed back towards Boomtown, as instructed by Ms. Katz, who remained on the phone. However, at some point, as they were returning to Boomtown, Defendant made a turn, returning them to Williams Boulevard, and again headed in the direction of the interstate.

According to Ms. Tyler, Defendant turned onto Veterans, headed towards Roosevelt Boulevard, and then suddenly turned off Veterans and headed towards Boomtown. She testified that she did not have the opportunity to jump out of the vehicle because Defendant did not fully stop at stop signs and all of the lights were green.[8] Ms. Tyler testified that she was scared and asked to exit the vehicle multiple times, but that Defendant refused to slow down or let her exit the vehicle. She recalled Defendant bickering on the phone with Ms. Katz, some kind of escalation concerning involving the police, stating that Defendant "thought that if she went back, that we was [sic] going to have her arrested." Ms. Tyler testified that once Defendant became aware of the potential police involvement, "the situation just became no better. She still wouldn't go return me back." Ms. Tyler testified that, at this point, Defendant again made a U-turn and redirected the vehicle back towards Veterans and the interstate.

---

[8] On cross-examination, Ms. Tyler confirmed that she did not mention Defendant running through stop signs in her written statement for the police, but reiterated that it did happen. Ms. Tyler's statement was marked for identification purposes as Defense Exhibit 1, it was not admitted into evidence.

Ms. Tyler testified that, directly thereafter, Defendant drove the vehicle onto the interstate. She re-iterated that all the lights on Veterans, leading up to the interstate, were green so she could not have safely exited the vehicle, and that Defendant repeatedly denied her requests to get out of the car. She testified that she could not say exactly how many times she asked to get out of the car, but that she had asked "plenty" and was just scared and "wanted to get out the car." She described incessant telephone bickering among her, Defendant, and the Boomtown employees on the other end of the phone; "it just was going on and on."[9] She testified that eventually she got the phone back from Defendant, but stayed on the call to keep her coworkers apprised of her location and because she "felt like [her] life was in danger."

Ms. Tyler explained that she was panicked, believing that she would not make it back home. She recalled Defendant entering the interstate at the Veterans on-ramp near Lafreniere Park and "gunned the car." Ms. Tyler testified that Defendant told her that she wanted to drive the car to Gentilly, where Defendant would get out, and then Ms. Tyler could drive the vehicle back to Boomtown. Ms. Tyler testified that she told Defendant that she could not drive the car to Gentilly. She testified that she knew that officers were en route and that she did not want to end up in a high-speed chase. Therefore, as Defendant proceeded to "take off placing the Interstate," Ms. Tyler grabbed the steering wheel, pulled the vehicle to the side of the interstate, took the keys out of the ignition, exited the vehicle, and began running. She explained that Defendant then got out of the vehicle and began "hollering" at a "MAP driver" nearby. Ms. Tyler testified that, at that point, while Defendant was out of the car, she then ran back to the vehicle, got in, and drove back to Boomtown. She testified that this was her first, safe opportunity to get away from Defendant. Upon returning

---

[9] On cross-examination, Ms. Tyler testified that Defendant did not keep her from holding the phone or speaking to her boss, Mrs. Katz, or colleagues at Boomtown.

to Boomtown, where an officer was waiting for her, Ms. Tyler spoke to the officer and provided a written statement. Ms. Tyler testified that, for some time after this incident, she refused to conduct test drives because she was scared to get in the car with someone for fear that a similar situation might occur.[10]

Ms. Katz testified that on May 7, 2018, she was working with Ms. Elwood and Ms. Tyler at Boomtown. She confirmed that she called 9-1-1 because of an incident involving a "customer" and Ms. Tyler while they were on a test drive. She testified that she became aware there was a problem when she overheard Ms. Elwood on the phone, saying, "you can't do—go on the Interstate." She stated that Ms. Elwood then told her that she needed to take the call. Ms. Katz explained that she was on speaker phone with Defendant and Ms. Tyler. She explicitly told Defendant not to take the vehicle onto the interstate and to stay on the route designated for test drives. She also told Defendant to return to Boomtown if she could not stay on the designated route. Ms. Katz testified that Defendant refused to stay on the designated route and also refused to return to Boomtown. She testified that Defendant, instead, asked her about the amount of miles within the designated route. Ms. Katz told Defendant that she did not know the exact mileage, but reiterated that Defendant must keep to the designated route.

Ms. Katz testified that Defendant was not only upset that she could not take the vehicle onto the interstate, but was also bothered by the fact that Boomtown had taken a copy of her driver's license. Ms. Katz informed Defendant it was standard practice to make a copy of a potential customer's driver's license prior to a test drive, but that she would be happy to return the copy of Defendant's license to Defendant upon the return of the vehicle. Ms. Katz testified that Defendant still did not return to Boomtown at that time.

---

[10] On cross-examination, Ms. Tyler testified that while Defendant did not have a weapon and did not make any "threats of physical harm or otherwise," "her actions showed it."

Ms. Katz testified that she continually pleaded with Defendant to safely return Ms. Tyler to Boomtown, and that "at one point when [Defendant] was saying no, I said, you are kidnapping her. We're going to call the police. Bring her back." She testified that Ms. Tyler's voice sounded terrified and that she asked for Defendant to safely return Ms. Tyler "four, five, six times. I just kept saying bring us back Bea." Ms. Katz testified that Defendant just responded, "Well, you called the police." Ms. Katz explained to Defendant that she had not yet actually called the police, but that she really would if Defendant did not return Ms. Tyler, "and she refused."

Throughout the incident, Ms. Katz testified that she just kept thinking, "This is terrible. This has never happened…They have your employee. They have your friend, like a family member. Where is she going? What is she going to do? What—this is—it's terrible on our end because we don't know what's going on." Ms. Katz ultimately contacted the police and provided the officer with a written statement upon his arrival to Boomtown. While she was providing her official statement, Ms. Tyler contacted her.[11] Ms. Katz testified that she handed the phone to the police officer to speak to Ms. Tyler. Ms. Tyler was returning to Boomtown after getting the vehicle back from Defendant. Ms. Katz testified that, when Ms. Tyler returned to Boomtown, she was in shock, "she just sat there."

Ms. Elwood testified that her job duties at Boomtown included GPS tracking, answering phone calls, collections, and filing. Ms. Elwood recalled working on May 7, 2018, and making a photocopy of Defendant's driver's license. She testified that Defendant took a 2006 Lexus, which was equipped with a GPS tracker, for a test drive. She recalled receiving a phone call from Ms. Tyler, who sounded "panicked and scared." After giving the phone to Ms. Katz, who she testified also sounded panicked and scared, Ms. Elwood began tracking the vehicle on a website,

---

[11] On cross-examination Ms. Katz confirmed that at some point during the incident, the phone became disconnected, she did not know by whom. When she later called back, Ms. Tyler answered the phone, and they were able to speak.

pinpointing the vehicle at several locations. She testified that it appeared the vehicle was heading towards the interstate, and she eventually tracked it to the interstate.[12]

She testified that at 1:35 p.m., she was able to ping the vehicle between 2200-2248 25th Street in Kenner and that the vehicle was in motion.[13] At 1:36 p.m., she was able to ping the vehicle at 2108 25th Street in Kenner and then, after two unsuccessful attempts to locate the vehicle, she again located the vehicle driving between 2200-2248 25th Street in Kenner at 1:40 p.m.[14] The vehicle was next located in motion on Veterans at 1:45 p.m. Ms. Elwood then testified that at 1:48 p.m., she was able to ping the vehicle on the interstate. She testified that it was eventually stopped at this location on the interstate. The vehicle was next located as driving on the interstate at 1:50 p.m. She testified that at 1:55 p.m., the vehicle was on West Napoleon and traveling south towards Boomtown. She described Ms. Tyler as "panicked and scared" when she returned to Boomtown.

Officer Brian Fogarty with the Kenner Police Department testified that on May 7, 2018, he was dispatched to Boomtown regarding an incident, which involved a vehicle and Defendant. Upon his arrival, he spoke with Ms. Katz and obtained a written statement from her. He also obtained a written statement from Ms. Tyler when she arrived. He described Ms. Tyler's demeanor as "visibly upset" and that "she looked like she had a lot of anxiety." Officer Fogarty explained that he asked to speak with Defendant when she called Boomtown later that day. He instructed

---

[12] Ms. Elwood identified State's Exhibit 5 as the detailed report for the Lexus that she printed out from her server at Boomtown. She confirmed that it reflects all actual pings and attempted pings that she made on the vehicle on May 7, 2018. State's Exhibit 5 was entered into evidence and published to the jury.

[13] Ms. Elwood explained that the GPS report stated that at 1:35 p.m. the vehicle was in "Drive" which is how she knows it was in motion. The GPS report indicated that the second ping indicated "Response: Locate," not "Drive," which meant that the vehicle was merely located; she testified that the vehicle potentially could have been stopped at a stop sign or stop light. She confirmed that the vehicle was not being driven at that moment.

[14] Ms. Elwood recalled "going too fast" and being "panicked" while attempting to ping the vehicle's location, which led to moments during the test drive where she was unable to get the coordinates of the vehicle. Ms. Elwood explained that "sometimes when you track—try to track down too many times, it won't locate right away." On cross-examination, Ms. Elwood explained that an "attempt locate" meant that the vehicle was not able to be located. She testified that this did not mean the program was inoperable.

20-KA-215         7

Defendant to meet him at the Kenner Police Department. He testified that Defendant did not tell him whether or not she would meet with him, and that she did not appear at the department. Based on his investigation, Officer Fogarty applied for an arrest warrant for Defendant.[15] Officer Fogarty stated that he was later informed that Defendant was "booked on that warrant." He confirmed that his police report did not state that Defendant prevented Ms. Tyler from using the phone or mention any weapons and threats. He testified that the report did not mention anything about running stop signs or speeding. Upon the conclusion of Officer Fogarty's testimony, the State rested its case. The defense then called Defendant to testify.

Defendant testified that she first saw the vehicle on April 9, 2018, and that she contacted Boomtown the following day. She had three communications with the dealership that month—once on April 10, 2018, and twice on April 12, 2018. On May 7, 2018, she contacted Boomtown around 12:15 p.m. to determine if she could test drive the vehicle. She also asked if there would be enough time for her to return to school for an exam at 3:00 p.m. When she arrived, Defendant looked at the vehicle, and then Ms. Tyler came out and introduced herself. Defendant recalled answering a phone call at 12:38 p.m. which lasted about thirty-five minutes. After the phone call, Defendant asked if there was anything that she needed to sign or be aware of before taking the vehicle for a test drive.

Defendant testified that she handed in her "driver's license and a picture of it was taken with the cell phone." She testified that she "said the copy machine is right there. You really need to take a picture on my cell phone?"[16] Defendant then testified that she asked Ms. Tyler to drive the vehicle off of the lot because the parking lot was difficult to maneuver. She testified that once she took over driving,

---

[15] Officer Fogarty's arrest warrant was marked as State's Exhibit 6 and entered into evidence for record purposes only.

[16] On cross-examination, Defendant testified that Ms. Katz told her she would make a copy of the license, but what she actually observed was Ms. Katz taking a picture of the license on her personal cellphone.

Ms. Tyler began providing her with directions via hand signals. Defendant stated that Ms. Tyler did not discuss the route with her prior to getting in the car and that Ms. Tyler was directing them "around in circles."

Defendant testified that she was confused as to whether the vehicle was a 2004 or a 2006 Lexus and that Ms. Tyler did not know. Nevertheless, she liked the vehicle, and said, "Let's bring this baby on the Interstate, like let's see how it rides." She testified that Ms. Tyler responded that they could not take the vehicle onto the interstate because it did not have enough gas. Defendant asked if they could stop for gas. Ms. Tyler told her that she did not have any money; Defendant testified that she then offered to pay for the gas. Defendant testified that Ms. Tyler responded, "Well, you got to call the boss lady," which is why they called the dealership.

Defendant testified that she initially spoke with a man[17] about the vehicle's actual make, model, and mileage because it did not match with the buyer's guide on their website. She asked for permission to stop and get gas in order to take the vehicle on the interstate to drive to "Louisa" and travel back to Boomtown, which was her normal route for school.[18] Defendant testified that the man put her on hold for four minutes and then came back and told her to call again later because Ms. Katz was unavailable.

Defendant testified that she called back after a few minutes and spoke to Ms. Katz about the vehicle's make and model. She testified that while at a red light she told Ms. Katz that she wanted to take the vehicle onto the interstate to drive to Louisa, but would need to stop for gas. Defendant informed Ms. Katz that they were approaching a gas station, and she asked for permission to stop for gas. She stated that Ms. Katz told her that Boomtown's insurance would only provide for a limited number of miles per test drive, but that Ms. Katz could not tell her exactly how many

---

[17] She testified it was the same white male who had been in the dealership with her.
[18] On cross-examination, Defendant clarified that Louisa is the exit for her school in Gentilly. She confirmed that she wanted to test drive the vehicle from Kenner to Gentilly.

miles were allowed. She testified that she asked Ms. Katz for an estimated number of miles, and told Ms. Katz that she did not have to go on the interstate and could take a different route within the allotted mileage.

Defendant testified that she ultimately chose not to get gas because she was "going back and forth" with Ms. Katz. She testified that she began "picking up that something's not right" because Ms. Katz was "not telling [her] the miles." She testified that she could not understand why she was not provided this information prior to Boomtown taking a photo of her license. She then asked Ms. Katz to delete the picture of her driver's license from the cell phone on which it was taken because she was afraid that her information would be shared. Defendant testified that she "had to get on the interstate" because she was in the far right lane for gas, but then later, on cross-examination, agreed that it was by her own volition that she took the vehicle on the interstate.[19]

Defendant testified that she informed Ms. Katz that she was approaching the interstate, and Ms. Katz said that she was "calling the cops" and hung up the phone. Defendant testified that she told Ms. Tyler about her conversation with Ms. Katz and that Ms. Tyler asked, "Why is she going to call the police?" Defendant testified that as she was preparing to exit the interstate, Ms. Tyler asked, "What are you doing?" Defendant testified that when she explained that she was turning around to delete the photograph of her driver's license, Ms. Tyler started punching the dashboard of the vehicle, cursing, and saying that she "can't deal with the police." Defendant testified that Ms. Tyler was "practically crying" and repeatedly told her to keep driving. Defendant testified that Ms. Tyler offered to bring Defendant to school and said that she would "deal with [Ms. Katz]" after she returned to Boomtown.

---

[19] Defendant testified that while Ms. Tyler did not direct her onto the interstate, she never actually told Defendant not to go on the interstate.

Defendant testified that Ms. Tyler received several short phone calls, stating that the calls were from her cousin. Defendant stated that Ms. Tyler refused to answer when asked if it was actually Ms. Katz calling her cell phone. Defendant asked Ms. Tyler to call Ms. Katz and let her know that she was bringing Defendant to school, but Ms. Tyler refused. Defendant testified that she told Ms. Tyler that she was going to bring the car back to Boomtown and call the police. She testified that Ms. Tyler began hysterically screaming and shaking. Defendant explained that Ms. Tyler threw the car into neutral, reached over, twisted Defendant's wrists, and propelled the vehicle from the middle lane toward the shoulder of the road. Defendant explained that during this melee she tried to keep them both safe, managing to get the vehicle on the shoulder of the interstate while Ms. Tyler held both of her hands. After the vehicle stopped, Ms. Tyler placed the vehicle in park and grabbed the keys. Ms. Tyler then ran out of the vehicle and locked the doors. Defendant at that point exited the vehicle and saw a "MAP driver" nearby.[20] She ran to his vehicle and tried to explain to him what had occurred.[21] Defendant testified that, through his mirror, the MAP driver watched Ms. Tyler re-enter the vehicle and drive away.

Defendant testified that she later called the dealership and that the call was on speakerphone. She asked, "Who is it that you had in the car with me? Who is this person? Do you know what she just did?" Defendant testified that "they" began laughing at her because "they knew that [Ms. Tyler] had put [her] out on the interstate." She informed them that she would call the police after taking her exam. Defendant explained that she saw a state trooper on her way home from school, and she told him everything that had happened. She testified that she tried to call the

---

[20] Defendant testified that she attempted to exit the vehicle from the passenger side but that because it was locked she was forced to exit from the driver's side.

[21] Defendant testified that she screamed and cried when she told the driver what had occurred. She said that the driver was shocked and scared.

police three times when she returned home around 7:00 p.m. Defendant testified that she tried to make a report and wrote to various agencies for about two weeks, but that no one would take her report. She stated that her last attempt to call a state trooper occurred on either May 13 or 14. Defendant testified that she never spoke with Officer Fogarty and that she did not speak to any officer who instructed her to go to a police station.

At the conclusion of trial, on January 28, 2020, the jury unanimously found Defendant guilty on count one, unauthorized use of a motor vehicle, and not guilty on count two, simple kidnapping of Ms. Tyler.[22] On February 5, 2020, Defendant filed a motion for new trial, which the trial court denied the following day. Immediately following the denial of Defendant's motion for new trial on February 6, 2020, the trial court sentenced Defendant to imprisonment at hard labor for one year. The trial court then suspended Defendant's sentence and placed her on active probation for a term of two years. On February 7, 2020, Defendant timely filed a motion for appeal, which was granted on February 13, 2020.

## Law and Discussion

The question of sufficiency of the evidence is properly raised by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Eliis*, 18-463 (La. App. 5 Cir. 07/15/19), 276 So.3d 633, 642. Here, Defendant did not file a post-verdict judgment of acquittal. On February 5, 2020, Defendant filed a motion for new trial. Nevertheless, the failure to file a post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. *State v. Thomas*, 08-813 (La. App. 5 Cir. 04/28/09), 13 So.3d 603, 606 n.3, *writ denied*, 09-1294 (La. 04/05/10), 31 So.3d 361 (citing *State v. Washington*, 82-74 (La. 10/29/82), 421 So.2d 887, 889).

---

[22] The jury unanimously found Defendant not guilty as to count two, simple kidnapping.

The standard of review for sufficiency of the evidence challenges is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. It is not the function of the appellate court to assess credibility or reweigh the evidence; rather, a reviewing court must consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 09/06/19), 278 So.3d 372 (citing *State v. Williams*, 98-1146 (La. App. 5 Cir. 06/01/99), 738 So.2d 640, 648, *writ denied*, 99-1984 (La. 01/07/00), 752 So.2d 176; *State v. Juluke*, 98-341 (La. 01/08/99), 725 So.2d 1291).

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Caffrey,* 08-717 (La. App. 5 Cir. 05/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 02/05/10), 27 So.3d 297. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *See State v. Bailey*, 04-85 (La. App. 5 Cir. 05/26/04), 875 So.2d 949, 955, *writ denied*, 04-1605 (La. 11/15/04), 887 So.2d 476, *cert. denied*, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt. *State v. White*, 07-831 (La. App. 5 Cir. 3/11/08), 982 So.2d 843, 846, *writ*

*denied*, 08-0846 (La. 10/31/08), 994 So.2d 534. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08), 982 So.2d 146, 153, *writ denied*, 08-987 (La. 1/30/09), 999 So.2d 745.

In her sole assignment of error, Defendant asserts that the evidence was insufficient to support her conviction of unauthorized use of a motor vehicle. Defendant contends that the state failed to meet its burden of proving beyond a reasonable doubt that she possessed the *mens rea* or evil intent necessary under the law. Rather, she asserts, that the evidence was clear that she possessed a motor vehicle belonging to another and that her only crime was steering the vehicle onto the interstate "for a few minutes of travel." Defendant argues that her actions of refusing to abide by the owner's commands "hardly evidenced criminal intent."

In its response, the State argues that the fraudulent intent requirement is to "prevent the unwarranted encroachment of criminal sanctions into new areas traditionally handled between the parties themselves." The State asserts that the Louisiana Legislature has made it clear that intentional use of a motor vehicle without consent is a crime.[23] The State contends that Ms. Tyler and Ms. Katz both told Defendant that she could not drive the Lexus on the interstate, but Defendant deliberately "did what she had been repeatedly told she could not do." The State asserts that Defendant's actions satisfied the statutory requirements of unauthorized use of a motor vehicle, that Louisiana law has recognized any intentional use of the vehicle without consent as a crime, and that La. R.S. 14:68.4 does not require that

---

[23] The State asserts that the Defendant's initial permission to possess the Lexus did not immunize her from criminal prosecution. *See discussion on limited consent, infra.*

the unauthorized use "persist for any particular period of time or involve any particular distance."

Under La. R.S. 14:68.4, unauthorized use of a motor vehicle is defined as the intentional taking or use of a motor vehicle which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the motor vehicle permanently. This Court has repeatedly found *State v. Bias,* 400 So.2d 650, 652-53 (La. 06/22/81), a case involving a virtually identical statute— La. R.S. 14:68,[24] unauthorized use of a movable—instructive in interpreting the statute at issue in the instant case—La. R.S. 14:68.4, unauthorized use of a motor vehicle. *See White*, 982 So.2d at 846; *State v. Joseph,* 05-368 (La. App. 5 Cir. 1/17/06), 921 So.2d 1060, 1063; *State v. Varnado*, 01-367 (La. App. 5 Cir. 9/13/01), 798 So.2d 191, 193; *State v. Spencer*, 97-811 (La. App. 5 Cir. 1/27/98), 707 So.2d 119, 120. The *Bias* Court expressly found that the "statute proscribing the unauthorized use of a movable requir[es] a showing of *mens rea* or criminal intent, since the 'evil' state of mind of the actor normally distinguishes criminal acts (punishable by the state alone) from mere civil wrongs (actionable by private individuals against one another)." *Bias*, 400 So.2d at 652-53. Likewise, this Court has consistently construed the present statute proscribing unauthorized use of a vehicle as also requiring a showing of *mens rea* or criminal intent. *See White*, 982 So.2d at 846; *Joseph*, 921 So.2d at 1063; *Varnado*, 798 So.2d at 193; *Spencer*, 707 So.2d at 120. Then, in *State in Int. of C.T.*, 16-939 (La. 10/18/17), 236 So.3d 1210, 1212-13,[25] the Louisiana Supreme Court clarified that

---

[24] La. R.S. 14:68 provides the following: "Unauthorized use of a movable is the intentional taking or use of a movable which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the movable permanently."

[25] In a juvenile delinquency proceeding, the State's burden of proof is the same as in a criminal proceeding against an adult—to prove beyond a reasonable doubt every element of the act alleged, in this case unauthorized use of a motor vehicle pursuant to La R.S. 14:48.4. *State in Int. of C.T.*, 236 So.3d at 1211.

the State need only prove a vehicle was knowingly used without the consent of the owner to sufficiently establish the element of criminal intent under La. R.S. 14:68.4.

In the instant matter, we find that the State sufficiently proved that Defendant had the requisite criminal intent to commit the crime of unauthorized use of a motor vehicle where it clearly established that Defendant committed an intentional taking without the owner's consent. Defendant asserts that, because she was a "permitted possessor" of the Lexus for the duration of the incident, "having first provided to the owner [of the vehicle] a copy of her valid drivers' [sic] license, and during the entire drive was accompanied by the owner's employee," her actions of driving on the interstate—though against the owner's commands—did not demonstrate criminal intent. However, Louisiana jurisprudence clearly establishes that consent may be limited and that any use of a motor vehicle surpassing the limited consent provided may constitute a violation of La. R.S. 14:68.4.

In *Spencer*, 707 So.2d at 121-22, this Court found sufficient evidence to uphold the defendant's conviction for unauthorized use of a motor vehicle when he took a vehicle from a car dealership for a test drive, with the dealership's consent, but failed to return the vehicle within a 24-hour period. *Id*. The defendant argued there was insufficient evidence to prove he had the requisite criminal intent to commit the crime of unauthorized use of a motor vehicle where "his actions were within the normal scope of a person interested in purchasing a new vehicle." *Id*. at 121. Citing the salesman's testimony that he did not give the defendant permission to keep the car for 24 hours, this Court found that a rational jury could have found the requisite criminal intent beyond a reasonable doubt. *Id*.

Likewise, in *State v. Colbert*, 04-538 (La. App. 5 Cir. 11/30/04), 889 So.2d 1128, 1133, this Court affirmed the defendant's conviction for unauthorized use of a motor vehicle, finding that a rational trier of fact could have reasonably found that

the defendant possessed the requisite criminal intent based on his failure to respond after being asked to return the vehicle. Then in *Varnado*, 798 So.2d at 193-94, this Court upheld a conviction of an employee who used the employer's vehicle during the weekend without consent. There was testimony in that case that employees were never permitted to take company cars home for the weekend. This Court concluded, among other things, that a rational juror could have reasonably found that the defendant possessed the requisite criminal intent to support a conviction for unauthorized use of motor vehicle where he took the company vehicle over the weekend and acted beyond the limited consent his employer provided him.

In *State v. White*, 07-831 (La. App. 5 Cir. 03/11/08), 982 So.2d 843, *writ denied*, 08-846 (La. 10/31/08), 994 So.2d 534, this Court found sufficient evidence to uphold a conviction for the unauthorized use of a motor vehicle. In that case, the defendant, a vehicle dealership employee, was given limited consent to drive the dealership vehicles when he was accompanied by either the dealership's owner or manager. On the day in question, the defendant took a vehicle from a dealership without the accompaniment of the dealership's owner or manager. According to the police officer's testimony, the defendant stated he was worried that he was not going to get paid because he took the car. This Court stated that the defendant's statement indicated guilty knowledge such that a rational juror could have concluded that the defendant took the dealership vehicle without consent. *Id*. at 847.

Additionally, other Circuit Courts have similarly found sufficient evidence to support a conviction for unauthorized use of a motor vehicle in cases where the defendant used a motor vehicle in a manner that deviates from the limited consent provided to him or her. In *State v. Coleman*, 02-1487 (La. App. 4 Cir. 10/09/02), 830 So.2d 341, the Fourth Circuit held that the evidence was sufficient to support a conviction for attempted unauthorized use of a motor vehicle. In that case, the

defendant was an employee authorized to use a company van for a certain period of time along a specific route. The defendant argued that the State needed to prove that he "harbored fraudulent intent." *Id.* at 343. However, the Fourth Circuit stated that La. R.S. 14:68.4 provides that the State may either prove an intentional taking without the owner's consent *or* an intentional taking by means of fraudulent conduct, and held that once the defendant deviated from the route and schedule, he violated the statute. *Id.* Similarly, in *State v. LaCombe*, 09-544 (La. App. 3 Cir. 12/09/09), 25 So.3d 1002, 1003, the Third Circuit found that the defendant had the requisite criminal intent beyond a reasonable doubt in a scenario in which he was hired as a truck driver and directed to drive the company's eighteen-wheeler along a designated route and he went beyond that route.

In the present case, Defendant initially had permission to take the vehicle for a test drive, but she was limited to a designated route, and Defendant knowingly disregarded the limited consent provided to her by intentionally driving the dealership vehicle beyond the designated route onto the interstate. Boomtown's owner, Ms. Katz, revoked her consent of Defendant's use of the vehicle during her phone conversation with Defendant on May 7, 2018, when she explicitly told Defendant to return to Boomtown if she could not stay on the designated route. Ms. Tyler likewise testified that Defendant was denied permission to drive the car on the interstate because of insurance limitations and Defendant confirmed that Ms. Katz informed her that she could not take the vehicle on the interstate. Defendant admitted that she, of her own volition, nevertheless chose to disobey the interstate limitation.

A reasonable jury could have concluded that once Defendant deviated from the designated route, she knew her use of the vehicle was unauthorized. Alternatively, and of equal weight, a rational jury could have found that Defendant

possessed the requisite criminal intent based on her failure to return the vehicle to Boomtown after being asked to do so. *See Colbert*, 889 So.2d at 1133. Also, a rational jury could have concluded that the Defendant's requests to be dropped off in Gentilly and have Ms. Tyler return the vehicle, as well as her failure to return to Boomtown or the Kenner Police Department, indicated an awareness of wrongdoing and/or guilty knowledge because she had taken the vehicle onto the interstate without consent. *See White*, 982 So.2d at 847. In any event, Defendant's admittedly intentional taking of the vehicle onto the interstate undoubtedly surpassed the limited consent Boomtown provided to her.

We recognize that Defendant claims that the corroborating testimony of Ms. Tyler, Ms. Katz, Ms. Elwood, and Officer Fogarty is all untruthful; however, the jury chose to accept their testimony over Defendant's and this Court will not second-guess the jury's credibility determinations.[26] *See State v. Norman*, 20-142 (La. App. 5 Cir. 12/30/20), 310 So.3d 287, 295 ("It is the role of the fact-finder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluation under the *Jackson* standard of review."); *see also White*, 982 So.2d at 847.

Based on our review of the testimony, and considering all of the evidence, we find that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that Defendant committed the crime of unauthorized use of a motor vehicle, in violation of La. R.S.

---

[26] We further point out that Defendant's testimony contradicts itself. She first testified that she tried to call various police stations and agencies to report the incident between May 7, 2018 and May 14, 2018, but no one would take her report. Defendant then acknowledged that her prior testimony that no police officer would listen to her or take her report was an inaccurate description of the truth. She also testified that she did not contact the Better Business Bureau, Used Motor Vehicle Commission, "among other places" where she intended to report the incident, until weeks before trial.

14:68.4. We find that sufficient evidence was introduced at trial to establish all elements of the offense.

## Errors Patent

This Court routinely reviews the record on appeal for errors patent regardless of whether the defendant makes such a request. La. C.Cr.P. art. 920[27]; *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20) 308 So.3d 791, 839; *State v. Oliveaux*, 312 So.2d 337 (La. 03/17/75); *State v. Weiland*, 89-584 (La. App. 5 Cir. 01/17/90) 556 So.2d 175. The review reveals two errors in this case.

*Error No. 1:*

The trial court sentenced Defendant immediately after denying her motion for new trial. La. C.Cr.P. art. 873 requires a twenty-four-hour delay in sentencing after denial of a motion for new trial or in arrest of judgment, unless the defendant waives the delay. In this case, Defendant did not expressly waive the delay.

When the defendant challenges the penalty imposed and the imposed sentence is not mandatory, the failure to observe the twenty-four-hour delay mandated in La. C.Cr.P. art. 873 cannot be considered harmless error. *State v. Augustine,* 88-1297 (La. 02/05/90), 555 So.2d 1331; *State v. Colbert*, 04-538 (La. App. 5 Cir. 11/30/04), 889 So.2d 1128, 1135. As a general rule, when a defendant challenges a non-mandatory sentence, and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing. *State v. Sims,* 02-1244 (La. App. 5 Cir. 04/29/03), 845 So.2d 1116, 1123, *writ denied,* 03-2189 (La. 08/20/04), 882 So.2d 570.

In the instant case, defendant's sentence on her underlying conviction was non-mandatory. *See* La. C.Cr.P. art. 14:68.4. However, Defendant is not challenging her sentence on appeal.

---

[27] La. C.Cr.P. art. 920(2) states that an error patent is "[a]n error that is discoverable by an inspection of the pleadings and proceedings and without inspection of the evidence."

In *State v. Strickland*, 11-715 (La. App. 5 Cir. 03/27/12), 91 So.3d 411, 418-19, this Court found that the defendant tacitly waived the statutory delay provided in La. C.Cr.P. art. 873. We further found that the record suggested that the defendant knew he would be sentenced at the time of his sentencing hearing and came prepared with three witnesses to testify on his behalf. This Court stated that because the defendant did not raise the issue on appeal and had not shown that he suffered any prejudice as a result of the trial court error, "remand would be a useless formality." *Id*; *see also State v. Bibbins*, 13-875 (La. App. 5 Cir. 04/09/14), 140 So.3d 153, 169-70, *writ denied*, 14-0994 (La. 12/08/14), 153 So.3d 439, and *writ denied*, 14-1015 (La. 12/08/14), 153 So.3d 440.

Here, the record likewise indicates that Defendant knew she would be sentenced at the time of her sentencing hearing; she came prepared with two witnesses to testify on her behalf even though the judge found it unnecessary at that time. Absent a showing of prejudice from the failure to afford the statutory delay, reversal of a prematurely-imposed sentence is not required. *Bibbins*, 140 So.3d at 170 (citing *State v. Seals,* 95-0305, (La. 11/25/96), 684 So.2d 368, 380, *cert. denied,* 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997)). Accordingly, even if Defendant did not expressly waive the delay here, we find that she was not prejudiced by the trial court's failure to observe the delays and that it is unnecessary to remand this matter for resentencing.

Based on the foregoing, we find that corrective action on this error is not necessary.

***Error No. 2:***

Although the sentencing minute entry reflects that Defendant was given the advisal of the time period for seeking post-conviction relief as required by La.

C.Cr.P. art. 930.8[28], the transcript indicates that the trial court failed to actually provide that advisal.[29] The transcript prevails when there is a discrepancy between the commitment and the transcript. *State v. Lynch*, 82-859 (La. 11/28/83), 441 So.2d 732, 734; *State v. Montero*, 18-397 (La. App. 5 Cir. 12/19/18), 263 So.3d 899, 909. It is well settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *See State v. Perez*, 17-119 (La. App. 5 Cir. 08/30/17), 227 So.3d 864; *Bibbins*, 140 So.3d at 171; *State v. Taylor,* 12-25 (La. App. 5 Cir. 06/28/12), 97 So.3d 522, 538; *State v. Jacobs,* 07-887 (La. App. 5 Cir. 05/24/11), 67 So.3d 535, *writ denied,* 11-1753 (La. 02/10/12), 80 So.3d 468; *State v. Neely,* 08-707 (La. App. 5 Cir. 12/16/08), 3 So.3d 532, 538, *writ denied*, 09-248 (La. 10/30/09), 21 So.3d 272.

Accordingly, we now advise Defendant by way of this Opinion that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## Conclusion

For the foregoing reasons, we affirm Defendant's conviction and sentence.

**AFFIRMED**

---

[28] La. C.Cr.P. art. 930.8 provides that a defendant shall have two years after the judgment of conviction and sentence has become final to seek post-conviction relief.

[29] According to the transcript, the trial court stated, "And ma'am you do have two have [sic] after the judgment of conviction, the sentence become final to file for post-conviction relief, alright."

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**APRIL 28, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 20-KA-215

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN D. ENRIGHT, JR. (DISTRICT JUDGE)
MATTHEW R. CLAUSS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

### MAILED

BRUCE G. WHITTAKER (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                          (APPELLEE)
LOUISIANA APPELLATE PROJECT              DISTRICT ATTORNEY
1215 PRYTANIA STREET                     JOHN CARR (APPELLEE)
SUITE 332                                DISTRICT ATTORNEY
NEW ORLEANS, LA 70130                    LYNN SCHIFFMAN (APPELLEE)
                                         ASSISTANT DISTRICT ATTORNEYS
                                         TWENTY-FOURTH JUDICIAL DISTRICT
                                         200 DERBIGNY STREET
                                         GRETNA, LA 70053